IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

LESHANE J. HOLMES,

          Plaintiff,                No. CIV S-04-1308 RRB EFB P

     vs.

STEVE TEER,

          Defendant.          FINDINGS AND RECOMMENDATIONS

_____/

       Plaintiff is a prisoner without counsel seeking relief for alleged civil rights violations. *See* 42 U.S.C. § 1983. This action proceeds on the May 26, 2004, complaint[1] in which plaintiff alleges that (1) defendant Teer discriminated against plaintiff based on plaintiff's race by belittling him, assigning him to menial tasks while giving less qualified prisoners more difficult tasks, refusing to verify plaintiff's apprenticeship work hours, replacing plaintiff with a white prisoner and excluding plaintiff from a list of "critical workers" who were released from lock-down to perform essential tasks; and (2) defendant Teer fired plaintiff from his job as an electrician in retaliation for plaintiff's filing grievances against him. The matter is now before the court on defendant Teer's motion for summary judgment.

_____

[1] Defendant removed this action pursuant to 28 U.S.C. § 1441(a). May 26, 2004, is the date plaintiff filed his complaint in state court.

1

**I. Facts**

Plaintiff does not state the time frame during which the alleged violations occurred. However, the parties agree that on May 1, 1999, plaintiff commenced an apprenticeship to become a maintenance electrician.  Furthermore, defendant Teer has submitted evidence showing that he was the foreman of plaintiff's Inmate Day Labor ("IDL") work crew (explained below)  from May 2002 until October 2003.  Plaintiff has not disputed this evidence.  Thus, the court takes this to be the relevant time.

In order to understand these findings and recommendations, it is necessary to understand the basic structure of and connection between the apprenticeship and the IDL programs.  The IDL is a joint venture program of the State of California that employs prisoners confined within the California Department of Corrections and Rehabilitation (CDCR).  Rau Decl., filed August 18, 2006, at 2; Melton Dec., filed August 18, 2006, at 1-2.  This program permits employers to provide job opportunities for prisoners so they can obtain skills and habits that will enable them to be productive upon their release from prison.  California Department of Corrections Operations Manual ("DOM"), § 53140.1.  All prisoners hired by IDL for construction projects at CSP Solano are designated  "general laborers." Rau Decl., at 2.  General laborers must record their hours and IDL staff must certified them.  *Id.*  Thus, regardless of having experience in a particular vocation, a prisoner on an IDL crew may be directed to perform any and all tasks necessary at a construction site.  *Id.* at 2.  The apprenticeship program provided more specialized training.  Prisoners participated in particular vocational educational courses within the CDCR in order to obtain marketable skills.  To become indentured, and  apprentice was required successfully to complete classes in the area of their vocation before embarking on an assignment.  DOM § 53090.4.7.  After at least six months in an apprenticeship program and upon recommendation by the educators, a prisoner apprentice is eligible to be assigned to day labor projects.  *Id.*  In fact, an apprentice with the proper custody and classification levels must be given priority with respect to day labor assignments.  *Id.*  However, an apprentice who is

2

1   assigned to IDL or other programs must continue to have "four hours of related instruction" each

2   week.  Pl.'s Opp'n, filed September 12, 2006, Ex. D.

3          The facility apprenticeship coordinator makes all job assignments for apprentices.  *Id.*

4   When an apprentice receives an assignment, the facility apprenticeship coordinator must give

5   written notice thereof to the classification committee, the prisoner's counselor, the assignment

6   office and the prisoner.  *Id.*  The notice must also be placed in the prisoner's central file.  *Id.*

7   Other than removal for medical, custodial or legal reasons, an apprentice may not be removed

8   from his assigned training program without approval of the facility apprenticeship coordinator.

9   *Id.*

10         The parties agree that on November 1, 2003, all prison apprenticeship programs except

11  the HVAC/R program were discontinued.  Pl.'s Opp'n, Exh. D; Melton Decl., at 2.  Plaintiff has

12  submitted evidence that vocational instructors could follow particular guidelines to reinstitute

13  their particular program.  Pl.'s Opp'n, Ex. D.  There is no specific evidence that the electrical

14  apprenticeship program was reinstituted according to the applicable guidelines.

15         Prisoner apprentices must maintain a record of the hours worked toward satisfaction of

16  the apprenticeship agreement.  Melton Decl., at 2.  Only Vocational Instructors can verify that

17  these hours were completed.  *Id.* ; Pl.'s Opp'n, Ex. D.  While some apprenticeship work may

18  occur within IDL (explained below), the Apprenticeship Coordinator must approve it.  Melton

19  Decl., at 3; *see also* Pl.'s Opp'n, Ex. D.  Even within the apprenticeship program itself, a

20  prisoner must obtain permission from his supervisor to transfer from one work assignment to

21  another.  Melton Decl., at 3. Voluntarily leaving an assignment without permission terminates

22  participation in the apprenticeship program.  *Id.*  With this overview, the court turns to the facts

23  of this case.

24         At all times relevant to this action, plaintiff was a prisoner at California State Prison,

25  Solano (CSP Solano).  As stated, on May 1, 1999, plaintiff became an indentured apprentice in

26  the area of electrical maintenance.  Compl., Ex. A; Melton Decl., at 2.  He signed a formal

1   agreement requiring him to complete 6,000 hours between May 1, 1999, and May 1, 2002, to

2   record the hours he worked each day, and to have a Vocational Instructor verify his hours.

3   Compl., Ex. A; Melton Decl., at 2.  Manuel Ibarra and, after Ibarra retired in June 2001, Spencer

4   Wong, were plaintiff's Vocational Instructors, i.e., apprenticeship supervisors.  Melton Decl., at

5   2; Maiorino Decl., Ex. F, Pl.'s Dep. ("Pl.'s Dep.").  For the third quarter of 2000, Manuel Ibarra

6   reported that plaintiff's work performance was above average.  Compl., Ex. A.  Plaintiff actively

7   participated in the apprenticeship program until at least sometime in March 2002.  Pl.'s Dep.

8        In March 2002, plaintiff's only apprenticeship assignment was classroom-based.  *Id*.,

9   Pl.'s Dep. at 5.  Defendant submits evidence that plaintiff, without permission, left this

10   assignment in March 2002, and began working in the Metal Fabrication unit.  Melton Decl., at 3.

11   At his deposition, plaintiff admitted that he left his vocational class in February 2002, explaining

12   that since his teacher, Manuel Ibarra, had retired he did not think he could learn anything more.

13   Pl.'s Dep. at 5. Plaintiff did not get permission from the Vocational Instructors, their supervisors,

14   the Apprenticeship Coordinator or from the Metal Fabrication Unit supervisor to make this

15   change.[2]  *Id*., at 9, 11, 12.  While plaintiff did exclusively electrical work in the Metal

16   Fabrication Unit, Tom Melton, the Apprenticeship Coordinator, states in his declaration that

17   there are no written records showing that plaintiff had permission to transfer from one

18   assignment to another.  *Id*., at 12; Melton Decl., at 3.  Plaintiff believed he did not need written

19   permission from his instructor to leave one assignment and go to the next.  Pl.'s Dep. at 5, 9.   He

20   also believed that he was assigned to the Metal Fabrication Unit as an apprentice.  *Id*.  Plaintiff

21   submitted evidence that he received a letter dated December 24, 2003, from Apprenticeship

22   Consultant Terri A. Lutz.  Pl.'s Opp'n, Ex. F.  Ms. Lutz sent to plaintiff booklets for recording

23   his apprenticeship-related work, requested information about plaintiff's program, and requested

24

25        [2] On the bottom of a form styled, "Inmate Work Supervisor's Time Log," completed by
Vocational Instructor Wong, there is a notation stating, "03/05/02 - unassigned to MET - 3.093."
26   Maiorino Decl., filed August 18, 2006, Ex. D.  The parties do not explain this notation.

4

that she, plaintiff and his instructor have a telephone conference.  *Id.*

During the summer and fall of 2003, defendant Teer, an electrician with the International Brotherhood of Electrical Workers (IBEW), was employed as Electrical Foreman for IDL at CSP Solano.  Teer Decl., filed August 18, 2006, at 1.  Defendant Teer has never been a Vocational Instructor at Solano State Prison or any responsibility or authority within that program.  *Id.*, at 4.  Thus, he had no authority or responsibility to hire or fire any prisoner.  *Id.*, at 3.  He never was responsible for verifying plaintiff's work or hours.  *Id.*

From May 2002 until about October 2003, plaintiff was employed by IDL as a general laborer.  Rau Decl., at 2.  When plaintiff was hired, IDL recognized his basic electrical training.  Maiorino Decl., Ex. B at 1.  Teer submitted the declarations of Tom Melton and Brian Rau as evidence that this employment was not associated with any apprenticeship program.  Rau Decl., at 2.

Teer supervised a five-man IDL electrical crew working on new construction, repairs and renovations.  Teer Decl., at 2.  Several other crews, i.e., electrical, masonry and sheet metal, each with a supervisor, worked alongside Teer's crew.  Pl.'s Dep. at 17.   There also were prisoners who worked solely on maintaining the IDL worksites, which involved picking up demolition debris or carrying materials between job sites.  *Id.*  Plaintiff was on Teer's crew from about May 2002 until October 2003.  Teer Decl., at 1-2.  At deposition, plaintiff described a typical work day as involving either a project or "small things to do," including running conduit, changing panels, demolition and replacing "stuff," especially in the prison's medical facility, which was being renovated.  Pl.'s Dep. at 18.  Teer's crew also replaced light fixtures, junction boxes and completed other relatively small jobs associated with renovating an old facility.  *Id.*  Teer believed that clean equipment and a clean work environment were necessary for safety reasons.  Teer Decl., at 1-2.  Therefore, he required all the workers under his supervision, not just plaintiff, regularly to clean the job site by picking up trash, sweeping, washing equipment and cleaning light fixtures.  *Id.*  Plaintiff observed other prisoners sweep and pick up debris or trash before

leaving a work site, but he did not know whether Teer instructed them to do these tasks or not. Pl.'s Dep. at 17.   Plaintiff thought that only the maintenance crew consisted of "general laborers," and that it was their job was to keep the work area clean. *Id.*   Plaintiff submits the declaration of a fellow prisoner who states that in August or September of 2002, he heard defendant Teer tell plaintiff that he "would not authorize a jail-house electrician," and that plaintiff "would do better in the trade as a black female." Pl.'s Opp'n, Ex. G. Shortly after hearing these comments, he observed that plaintiff was performing tasks such as washing light fixture covers and repairing damaged power cords on tools while less qualified prisoners, such as a carpenter, were assigned to larger projects like installing conduit and installing power panels. *Id.*

Plaintiff has submitted documentary evidence in the form of "Work Supervisor's Reports" that for the quarterly periods of January through March 2003 and April through June 2003, an unidentified "supervisor" reported that plaintiff's work performance in IDL was exceptional. *Id.* However, he also submitted evidence that defendant Teer maintained a written record of plaintiff's poor attitude and job performance and his disrespect for other workers. Pl.'s Opp'n, Ex. H. Defendant Teer asserts that plaintiff's productivity was low, quality of work was poor, attitude and treatment of other prisoners were poor, and that he reported these concerns to the IDL supervisory management staff.   Teer Decl., at 3.  The general foreman, Brad Baker, also reported to his supervisor that plaintiff was causing friction with other workers and that his "work habits became sloppy and very unproductive." Maiorino Decl., Ex. B at 1.   In July 2003, when Teer found that plaintiff's work was sloppy and advised him to correct it, plaintiff was not receptive to the criticism. Teer Decl., at 3. Defendant Teer found at least two other electrical jobs of plaintiff were so substandard that they violated the National Electric Code, the industry standard. *Id.* at 4.  In August 2003, an IDL supervisor, Brian Rau found that plaintiff did not have a supervisor review his work on a transformer.  Rau Decl., at 3.  Rau examined the work and found that plaintiff did not ground the wires entering a 480-volt conductor, which could have

1  resulted in an explosion.  *Id.*  When Rau discussed the problem with plaintiff, plaintiff attempted

2  to blame other IDL employees.  *Id.*

3      In August or September of 2003, CSP Solano was placed on lockdown.  Teer Decl., at 3.

4  Thus, prisoners were not released from their cells for job assignments.  *Id.*  At some point,

5  defendant Teer was permitted to select two prisoners to be on the list of "critical workers," i.e.

6  workers who were permitted to return to their jobs.  *Id.*  Defendant Teer selected Sykes and

7  Mitchell, who are African American and Caucasian, respectively.  *Id.*  Several weeks later,

8  defendant Teer was permitted to select two more workers.  He selected Monteon and Pullen, who

9  are Hispanic and Caucasian, respectively.  Teer Decl., at 3.  Before this, Monteon worked for the

10  IDL custody maintenance crew.  *Id.* at 17.  Plaintiff asserts that Monteon was not qualified to be

11  on the electrical crew because he was hired as a "general laborer" but "expressed an interest in

12  becoming an electrician."  Pl.'s Dep. at 26.  Plaintiff  "was very vocal" about his belief that

13  Monteon was unqualified to do electrical work, and admits that there was "friction" between

14  himself and Monteon.  *Id.*   He also told defendant Teer that since the IDL was not a vocational

15  class, it was not right for Monteon to be on the crew.  *Id.*  Teer responded that plaintiff should

16  help Monteon to learn, and paired Monteon with Pullen.  *Id.*  In his declaration, Teer asserts that

17  he did not select plaintiff as a critical worker because plaintiff was the least productive member

18  of the crew, had the most difficulty getting along with other crew-members, and caused

19  disruption amongst co-workers by being unjustifiably critical of their work.  Teer Decl., at 3.  At

20  his deposition, plaintiff admitted that he was critical of the other electrical workers.  Pl.'s Dep. at

21  98-99.  This was so, he explained, because they were not qualified and their work was

22  substandard, which made him concerned for the safety of the work site.  *Id.*

23      On September 23, 2003, plaintiff filed a grievance against defendant Teer complaining

24  that he should have been selected as a critical worker.  Pl.'s Dep. at 24.  On October 1, 2003,

25  after the lockdown was lifted, plaintiff reported to the IDL crew.  *Id.*  He approached defendant

26  Teer to discuss his exclusion from the critical workers list.  *Id.*  At that time, defendant Teer said,

"You shouldn't have wrote that 602." *Id.*  Plaintiff explained to Teer the grievance process and his concerns about the apprenticeship and wanting critical worker status.  *Id.*  Teer responded by telling plaintiff, "Well, I got to let you go."  *Id.*  Plaintiff admits that Teer said that if it were Teer's decision to make, plaintiff would not be fired and that "higher ups" made the decision. *Id.*

A letter dated October 9, 2003, from a construction supervisor to plaintiff informs plaintiff that he no longer was part of the IDL crew with which he worked before the lockdown. Maiorino Decl., Ex. A.  The letter states that initially, a four-member crew was sufficient, but that once they decided to add a crew member, that person would not be plaintiff.  *Id.*  The letter states that the decision to replace plaintiff "was made by the lead electricians and myself," based on concerns of "the electrical supervisors about safety and work ethic."  *Id.*  In his declaration, defendant Teer states that he did not consider the newly hired prisoner, Bryant Fowlie, to be a replacement for plaintiff.  Teer Decl., at 4.

At deposition, plaintiff testified to his belief that Fowlie was hired to replace plaintiff even though he was less qualified.  Plaintiff believes that Fowlie was hired into the IDL ahead of about 150 other prisoners on the waiting list.  Pl.'s Dep. at 23.  In support of this belief, he said that Fowlie joined Teer's work crew about two weeks after plaintiff left, but while plaintiff officially was still assigned to it.  *Id.*  In addition, he explained, "[b]ecause the waiting list for IDL, there are inmates on the IDL, waiting list that had been on the list for eight months before they were called out there."  *Id.*  Plaintiff never had seen the list.  *Id.*  Plaintiff testified that Pullen was friends with Fowlie and tried to get Fowlie a job on the crew.  *Id.*  Plaintiff believed that Fowlie was "enrolled in a professional career development institute course for being an electrician," and testified that Teer said that Fowlie was "just trying to learn how to bend conduit."  *Id.*  Plaintiff believes that Fowlie, who was white, was unqualified for the position because Fowlie said that he had been hired as a carpenter.  Pl.'s Dep. at 26.

////

1    On March 9, 2004, IDL Construction Supervisor Steve Ponce drafted a document

2    requesting that plaintiff be "officially unassigned from the Inmate Day Labor (IDL) construction

3    crew."  Maiorino Decl., Ex. C.  Ponce based the request on "written information" received from

4    the previous supervisor and from plaintiff's on-site supervisors stating that plaintiff's poor

5    attitude and substandard, unsafe work made Holmes not well suited for that particular crew.  *Id.*,

6    Exs. B, C.  Ponce also noted that plaintiff had been excluded from the work-site since October of

7    2003.  *Id.*, Ex. C.  Finally, he noted that the evaluations reflecting plaintiff's above average IDL

8    performance were completed by a custody officer, not by a construction supervisor, and were

9    inaccurate.  *Id.*

10    In his declaration, defendant Teer denies ever having referred to plaintiff as a "prison

11    house electrician."  Teer Decl., at 4.  He also denies telling plaintiff that plaintiff should not have

12    filed an appeal about his exclusion from the critical workers list.  *Id.*

13    **II.  Standard for Summary Judgment**

14    Summary judgment is appropriate when there is no genuine issue of material fact and the

15    movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c); *Celotex Corp. v.*

16    *Catrett*, 477 U.S. 317, 322 (1986).[3]  The utility of Rule 56 to determine whether there is a

17    "genuine issue of material fact," such that the case must be resolved through presentation of

18    testimony and evidence at trial is well established:

19    [T]he Supreme Court, by clarifying what the non-moving party
    must do to withstand a motion for summary judgment, has
20    increased the utility of summary judgment. First, the Court has
    made clear that if the nonmoving party will bear the burden of
21    proof at trial as to an element essential to its case, and that party
    fails to make a showing sufficient to establish a genuine dispute of
22    fact with respect to the existence of that element, then summary
    judgment is appropriate. *See Celotex Corp. v. Catrett*, 477 U.S.
23    317 (1986).  Second, to withstand a motion for summary judgment,

24

25    [3]  On February 4, 2004, the court informed plaintiff of the requirements for opposing a
    motion pursuant to Rule 56 of the Federal Rules of Civil Procedure.  *See Rand v. Rowland*, 154
    F.3d 952, 957 (9th Cir. 1998) (en banc), *cert. denied*, 527 U.S. 1035 (1999), and *Klingele v.*
26    *Eikenberry*, 849 F.2d 409, 411-12 (9th Cir. 1988).

1
2
3
4
5
6

> the non-moving party must show that there are "genuine factual
> issues that properly can be resolved only by a finder of fact
> because they may reasonably be resolved in favor of either party."
> *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) (emphasis
> added).  Finally, if the factual context makes the non-moving
> party's claim implausible, that party must come forward with more
> persuasive evidence than would otherwise be necessary to show
> that there is a genuine issue for trial. *Matsushita Elec. Indus. Co. v.
> Zenith Radio Corp.*, 475 U.S. 574 (1986).  No longer can it be
> argued that *any disagreement* about a material issue of fact
> precludes the use of summary judgment.

7   *California Arch. Bldg. Prod. v. Franciscan Ceramics*, 818 F.2d 1466, 1468 (9th Cir.), *cert.*

8   *denied*, 484 U.S. 1006 (1988) (parallel citations omitted) (emphasis added).  In short, there is no

9   "genuine issue as to material fact," if the non-moving party "fails to make a showing sufficient to

10  establish the existence of an element essential to that party's case, and on which that party will

11  bear the burden of proof at trial."  *Grimes v. City and Country of San Francisco*, 951 F.2d 236,

12  239 (9th Cir. 1991) (quoting *Celotex*, 477 U.S. at 322).  There can be no genuine issue as to any

13  material fact where there is a complete failure of proof as to an essential element of the

14  nonmoving party's case because all other facts are thereby rendered immaterial.  *Celotex,* 477

15  U.S. at 323.

16  **III.  Analysis**

17        "As to materiality, the substantive law will identify which facts are material.  Only

18  disputes over facts that might affect the outcome of the suit under the governing law will

19  properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. at

20  248, 252.  Here, plaintiff's action arises under 42 U.S.C. Section 1983, and the First, Eighth, and

21  Fourteenth Amendments.  To prevail at trial, he must prove that the defendants deprived him of

22  his rights while acting under color of state law.  To prove that his First Amendment right of

23  access to the courts was violated, plaintiff must prove by a preponderance of competent evidence

24  that he was denied necessary assistance in preparing and filing a habeas corpus petition or

25  section 1983 complaint and that the deprivation actually injured his habeas or section 1983

26  litigation efforts.  *Lewis v. Casey*, 518 U.S. 343, 351, 354, 356 (1996).  To prove an Eighth

1    Amendment violation, plaintiff must show that the defendant knew plaintiff faced a risk of harm

2    that "is not one that today's society chooses to tolerate," and that the defendant was "deliberately

3    indifferent" to that risk. *Farmer v. Brennan*, 511 U.S. 825, 834, 837 (1994). To prove a

4    violation of the Equal Protection Clause, plaintiff must prove that the defendants intentionally

5    discriminated against him based upon membership in a protected class. *Lee v. City of Los*

6    *Angeles*, 250 F.3d 668, 686 (9th Cir. 2001); *Barren v. Harrington*, 152 F.3d 1193, 1194 (1998).

7    For the reasons explained below, the court finds there is no genuine issue for trial.

8         **A. Equal Protection**

9         Plaintiff claims that defendant Teer made racially derogatory remarks to him, assigned

10   him to menial tasks while giving less qualified prisoners more difficult ones, refused to verify

11   plaintiff's apprenticeship work hours, excluded plaintiff from a list of "critical workers" who

12   were released from lock-down to perform essential tasks, and ultimately fired him, replacing him

13   with a less qualified white prisoner. Defendant Teer contends there is no genuine issue about

14   whether he acted with discriminatory intent.

15        The Fourteenth Amendment's guarantee of equal protection is a command that states

16   treat similarly situated persons alike. *City of Cleburne, Tex. v. Cleburne Living Center*, 473 U.S.

17   432, 439 (1985) (per curiam). This guarantee applies inside prison walls. *Lee v. Washington*,

18   390 U.S. 333, 333 (1968). The Supreme Court has made clear that when a prisoner alleges

19   discrimination based on race, strict scrutiny applies. *Johnson v. California*, 543 U.S. 499, 509

20   (2005). The purpose of this level of scrutiny is to "smoke out illegitimate uses of race by

21   ensuring that the government's classification is closely fitted to the compelling goals that it seeks

22   to achieve." *Richmond v. J. S. Croson Co.*, 488 U.S. 469, 493 (1989). Thus, once a prisoner has

23   come forward with evidence of intentional race-based discrimination, prison officials have the

24   burden of proving by a preponderance of the evidence that the disparate treatment is a "narrowly

25   tailored measure [] that further[s] compelling governmental interests." *Adarant Constructors,*

26   *Inc. v. Pena*, 515 U.S. 200, 227 (1995); *Washington v. Davis*, 426 U.S. 229, 239-240 (1976).

1   **B.  Teer's Alleged Statements**

2       Plaintiff asserts that defendant Teer made racially derogatory remarks.  If true, the

3   statements of racial antipathy could serve as evidence of a racial motivation for the prison work

4   assignments, hours and other actions he challenges.  Verbal abuse alone is insufficient to

5   establish an equal protection violation but it can be evidence of racial animus.  *See Freeman v.*

6   *Arpaio*, 125 F.3d 732, 738 & n. 6 (9th Cir. 1997).  However, the statements alleged here fail to

7   show any suggestion of racial animus.[4]  The complaint alleges that Teer frequently referred to

8   plaintiff as a "prison house electrician" to emphasize that he received his electrical training while

9   in prison.  Compl. at 2.  Indeed, the complaint alleges that the comment was motivated by

10  plaintiff's status as a prisoner.  Prisoners are not a protected suspect class under the Fourteenth

11  Amendment that would trigger an elevated of scrutiny.  *City of Cleburne, Tex. v. Cleburne*

12  *Living Center*, 473 U.S. 432, 440 (1985) (discrimination based on characteristics other than race,

13  alienage, national origin and sex must be rationally related to a legitimate state interest).  Here,

14  however, under any level of scrutiny, plaintiff's complaint does not state a claim.  The verbal

15  abuse he alleges is not remotely racial in nature.  Therefore, no reasonable jury could find in

16  plaintiff's favor on this issue and defendant Teer is entitled to judgment as a matter of law.

17  **C.  Discrimination at the IDL Worksite**

18      Plaintiff alleges that defendant Teer, knowing that plaintiff was an apprentice for

19  electrical maintenance, assigned plaintiff to perform "menial chores and mundane tasks having

20  little to no trade value whatsoever, such as, [sic] washing light fixtures, sweeping up trash, etc.,"

21  but assigned tasks requiring electrical skills to those with less experience and training than

22  plaintiff.  Compl. at 2-3.  Defendant contends that there is no triable issue because plaintiff has

23

24      [4]  Defendant also points out that the alleged statement, "[y]ou would do better in the trade
    as a female," was not racially motivated.  Defs.' Mot. for Summ. J. at 7.  Regardless, plaintiff did
25  not include this alleged statement in his complaint.  The only statement that plaintiff seems to
    allege constitutes a freestanding violation of his rights is defendants' repeatedly referring to
26  plaintiff as a jailhouse electrician.  Thus, the court does not consider whether the "doing better in
    the trade" remark, standing alone, violated plaintiff's rights.

1   no "constitutional right to a prison job," and he was hired as a "general laborer," rather than as

2   an electrician.  Def.'s Mot. for Summ. J. at 9-10.  As a threshold matter, plaintiff does not

3   present this as a due process claim.  For purposes of the Equal Protection Clause, it does not

4   matter whether there is a constitutional right to a job.  The relevant question is whether

5   defendant treated plaintiff differently from similarly situated persons solely because of plaintiff's

6   race.  *See Walker v. Gomez*, 370 F.3d 969, 973 (9th Cir. 2004) ("racial discrimination in the

7   assignment of jobs violates equal protection).  It is undisputed that Teer was the electrical

8   foreman at the IDL construction site and that plaintiff was on Teer's crew.  From these two facts,

9   it is reasonable to infer that defendant Teer's authority extended to projects requiring electrical

10  skills, and that plaintiff was assigned to assist with those projects.  Thus, the only question is

11  whether defendant Teer excluded plaintiff from such projects because of plaintiff's race.

12          It is important to note that at trial, plaintiff has the burden of proving discriminatory

13  intent.  *See Walker*, 370 F.3d at 973.  Thus, in opposing this motion he must present evidence

14  that a reasonable fact finder could rely on at trial to "return a verdict for [him] on the evidence

15  presented."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 248, 252.  Defendant Teer has

16  submitted evidence that he believed a safe a work site must kept be clean, and that all crew

17  members were expected to help with a variety of tasks, such as digging trenches, removing

18  installation, concrete, sheet-rock or electrical materials.  There is no evidence that these activities

19  are wholly unrelated to electrical work done during construction at a prison.  Teer also has

20  submitted evidence that all crew members were expected to remove trash and debris, regardless

21  of an individual's level of electrical training and that he so directed them.  Plaintiff has not

22  shown a genuine issue in this regard.  At his deposition he conceded that he saw other crew

23  members picking up trash and the like.  He also admitted that he did not know if defendant Teer

24  had directed them to do it or if they were acting on their own initiative.  Plaintiff adduces

25  evidence, which defendant Teer disputes, that Teer told plaintiff that he "would not authorize a

26  jail-house electrician," and that plaintiff "would do better in the trade as a black female."

1   Plaintiff's evidence, also disputed by Teer, shows that shortly after Teer made these statements,

2   plaintiff was assigned to perform tasks such as cleaning light fixture covers and repairing broken

3   tools while prisoners with less electrical experience than he worked on larger, more complex

4   projects.  This dispute, however, is not material.  Even if a jury found plaintiff's evidence to be

5   true, it does not create a genuine issue about whether Teer acted out of racial animus.  As

6   explained above, the "jail-house electrician" statement singles out prisoners, not African-

7   Americans, or even African-American prisoners.  The "black female" comment alluding to race

8   and sex, is too thin a reed upon which to find a genuine issue of material fact in light of the other

9   evidence.  Perhaps a reasonable jury could conclude that Teer disliked plaintiff.  However,

10   personal animosity does not violate the Equal Protection Clause.  The evidence presented could

11   not justify a finding that defendant Teer directed plaintiff to perform jobs other than those

12   directly utilizing plaintiff's electrical skills because of plaintiff's race.  Teer is therefore entitled

13   to judgment as a matter of law on this claim.  *Celotex*, 477 U.S. at 322; *Anderson v. Liberty*

14   *Lobby, Inc.*, 477 U.S. at 248, 252.

15         **D.  Teer's Refusal to Verify Plaintiff's Work Hours**

16         Plaintiff alleges that defendant Teer prevented him from completing his apprenticeship

17   by refusing to verify the hours he worked so that he could report those hours within the

18   apprenticeship program.  Compl. at 3.  Defendant Teer argues that plaintiff's IDL work was not

19   part of an apprenticeship.  It is undisputed that CDCR policies would have permitted an

20   apprentice in the Electrical Maintenance program to work in IDL.  But it is immaterial whether

21   plaintiff was an apprentice who worked within IDL.  Defendant Teer has submitted evidence that

22   only Vocational Instructors could verify an apprentice's hours, and he was not a Vocational

23   Instructor.  Plaintiff has not submitted any evidence that defendant Teer was required to confirm

24   that plaintiff worked certain hours so that plaintiff could rely on his IDL work for his

25   apprenticeship.  Moreover, there is no evidence to even remotely suggest that Teer's failure to

26   verify hours had anything to do with the plaintiff's race.  Without evidence that defendant Teer

1   had the authority to verify hours worked in the apprenticeship program, or more improperly that

2   he treated plaintiff differently (e.g., verified hours for others but not plaintiff) because of racial

3   animus, no reasonable jury could find for plaintiff on this claim.  Accordingly, defendant Teer is

4   entitled to judgment as a matter of law on this claim.  *Celotex*, 477 U.S. at 322; *Anderson v.*

5   *Liberty Lobby, Inc.*, 477 U.S. at 248, 252.

6         **E.  Exclusion from the Critical Workers List**

7         Plaintiff claims that defendant Teer excluded him from the critical workers list because of

8   his race.  Defendant Teer asserts that he selected critical workers based on work performance

9   and attitude.  Again, as the party with the burden of proof at trial, plaintiff must be able to

10  produce evidence that this exclusion was the result of intentional, invidious discrimination.  It is

11  undisputed that Teer's entire crew consisted of two Caucasian workers, two African American

12  workers and one Hispanic worker.  Defendant Teer has submitted evidence that he was permitted

13  to select two prisoners at a time to be critical workers.  When given his first opportunity, he

14  selected one African American and one Caucasian worker. When given his second opportunity,

15  he selected one Hispanic and one Caucasian worker.  That defendant Teer selected an African

16  American as one of his two initial critical workers when there were five possible candidates

17  tends to show that race was not a factor in excluding plaintiff.  Again, while it is possible that

18  Teer disliked plaintiff, mere dislike does not violate the Equal Protection Clause.   There is no

19  evidence to establish a racial motivation here.

20        In addition, defendant Teer has submitted evidence that plaintiff's work was so

21  substandard that at times it violated national standards for the safety of electrical work.  He also

22  has submitted evidence that plaintiff did not get along well with the other crew members because

23  he was unjustifiably critical of their work.  Plaintiff asserts that defendant Teer has no records or

24  other documentary evidence suggesting that plaintiff's work was inadequate, and has submitted

25  evidence that plaintiff's work in January through March and April through June 2003 was more

26  than satisfactory.  But plaintiff does not submit any work performance reports from June 2003

1   through September 2003, the period immediately preceding the lockdown.  Nor does he submit

2   evidence showing that the specific work Rau and Teer described as falling below national

3   standards actually was completed satisfactorily.  Finally, plaintiff concedes that he criticized

4   other members of the IDL crew for their work.  His assertion that he was justified in doing so

5   because he was the only one with electrical training does not create any dispute about whether

6   his criticism was misplaced if only because it caused friction on the crew.  On this evidence, a

7   reasonable jury could not conclude that plaintiff's race was the motivating factor behind Teer's

8   declining to select plaintiff as a critical worker following the lockdown.  Therefore, Teer is

9   entitled to judgment as a matter of law on this issue.  *Celotex*, 477 U.S. at 322; *Anderson v.*

10  *Liberty Lobby, Inc.*, 477 U.S. at 248, 252

11          **F.  Decision to Fire Plaintiff**

12          Plaintiff claims that defendant Teer fired him from the IDL crew because of plaintiff's

13  race.  Teer asserts that he did not make the decision to fire plaintiff and that in any event,

14  plaintiff presents no evidence to prove discriminatory intent.  It also is undisputed that when

15  Teer was ready for five crew members after the lockdown, plaintiff was not hired.  Instead, a

16  white prisoner named Fowlie was hired.  It is undisputed that defendant Teer lacked authority to

17  hire and fire prisoners.  This was the job of prison officials.   However, there is evidence that a

18  prison supervisor informed Teer that his opinions about plaintiff would heavily influence any

19  decision about whether to retain or discharge plaintiff.  Thus, Teer had a great amount of

20  influence over whether plaintiff remained on the crew.  For purposes of summary judgment, the

21  court deems Teer's influence over this decision sufficient to confer liability on him.   However,

22  plaintiff has not submitted any direct evidence that Teer communicated any preference to the

23  supervisors.  The evidence is that Teer told plaintiff both that supervisors made the decision and

24  that Teer told plaintiff that he had to "let plaintiff go."  For purposes of summary judgment, the

25  court takes the evidence in the light most favorable to the non-moving party, plaintiff, and finds

26  that Teer's opinions were a motivating factor behind his supervisors' decision to remove plaintiff

1   from his work crew.  However, this does not establish that plaintiff was fired because of his race.

2         Plaintiff's beliefs about why Fowlie was hired in plaintiff's stead are insufficient to

3   withstand defendant's motion.  Plaintiff testified at deposition that Teer wanted Fowlie on the

4   crew, Fowlie "circumvented" the waiting list for that particular position, Fowlie was white, and

5   Fowlie was less qualified than plaintiff.  Since plaintiff has the burden of proof at trial and

6   defendant's motion is properly supported, plaintiff cannot survive summary judgment based on

7   unsupported beliefs.  He introduces no direct evidence whatsoever about Fowlie's qualifications,

8   whether Fowlie was not in fact next on the waiting list for the job, or if he was not, that there

9   was no reason to justify that decision.  Furthermore, as discussed above, plaintiff's evidence that

10  his work performance was above average does not cover the time immediately preceding the

11  lockdown and is contradicted by his own evidence that his performance was substandard.

12  Plaintiff does not submit evidence to contest Teer's evidence of plaintiff's substandard work on

13  several projects, and plaintiff caused friction on the crew.  On this evidence, no reasonable jury

14  could find that defendant Teer either caused plaintiff to be removed from the crew, or caused

15  Fowlie to be hired in plaintiff's stead, based on racial animus.  Accordingly, defendant Teer is

16  entitled to judgment as a matter of law on this claim.  *Celotex*, 477 U.S. at 322; *Anderson v.*

17  *Liberty Lobby, Inc.*, 477 U.S. at 248, 252

18        **G.  Retaliation**

19        Plaintiff claims that defendant Teer fired plaintiff in retaliation for filing a grievance

20  about not being selected as a critical worker.  Defendant Teer contends that plaintiff cannot

21  adduce evidence that being discharged from the work crew was connected to the grievance he

22  filed.  There are five elements to a retaliation claim: (1) an assertion that a state actor took some

23  adverse action against a prisoner; (2) because (3) the prisoner engaged in protected conduct; (4)

24  resulting in the chilling of plaintiff's First Amendment rights; and (5) the action did not

25  reasonably advance a legitimate penological goal.  *Rhodes v. Robinson*, 408 F.3d 559, 567-68

26  (9th Cir. 2003).  Institutional order and discipline are legitimate penological goals.  *Rizzo v.*

*Dawson*, 778 F.2d 527, 532 (9th Cir. 1985).  It is undisputed that plaintiff was discharged from

Teer's work crew after the lock-down.  It is undisputed that in September 23, 2003, plaintiff filed

a grievance about not being selected as a critical worker.  Pl.'s Dep. at 24.   Plaintiff adduces

evidence that on October 1, 2003, when he returned to the IDL work site, he went to speak with

Teer about being excluded from the critical workers' list.  *Id.*  Plaintiff testified at deposition

that Teer told plaintiff that he believed the grievance was personal, and then said that he had to

"let plaintiff go."  *Id.*  However, defendant Teer has submitted evidence that he legitimately was

concerned about the quality of plaintiff's work and plaintiff's ability to work well with other

crew members.  In the context of a prison work site, good work and the ability to work well with

others are legitimate goals equivalent to discipline and order.  On the evidence before the court,

no reasonable jury could find that Teer lacked a legitimate penological reason for having

plaintiff removed from the work crew.  Accordingly, Teer is entitled to judgment as a matter of

law.  *Celotex*, 477 U.S. at 322; *Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 248, 252

   For these reasons, it is RECOMMENDED that defendant's August 18, 2006, motion for

summary judgment be granted and that judgment be entered in his favor.

   These findings and recommendations are submitted to the United States District Judge

assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within 14 days after

being served with these findings and recommendations, any party may file written objections

with the court and serve a copy on all parties.  Such a document should be captioned "Objections

to Magistrate Judge's Findings and Recommendations."  Failure to file objections within the

specified time may waive the right to appeal the District Court's order. *Turner v. Duncan*, 158

F.3d 449, 455 (9th Cir. 1998); *Martinez v. Ylst*, 951 F.2d 1153 (9th Cir. 1991).

Dated:  August 29, 2007.

EDMUND F. BRENNAN
UNITED STATES MAGISTRATE JUDGE

18